SEALED BY ORDER
OF COURT

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

FILED

JUL 05 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1   Felicia Gilbert
    CA Bar #276348
2   John McKnight
    DC Bar #1031354
3   Sanford Heisler Sharp, LLP
    111 Sutter Street, Suite 975
4   San Francisco, Ca 94104
    Tel: (415) 795-2020
5   Fax: (415) 795-2021
    fgilbert@sanfordheisler.com
6   jmcknight@sanfordheisler.com

7   H. Vincent McKnight, Jr.
    DC Bar #293811
8   Sanford Heisler Sharp, LLP
    700 Pennsylvania Avenue SE, Suite 300
9   Washington, DC 20003
    Tel: (202) 499-5211
10  Fax: (202) 499-5199
    vmcknight@sanfordheisler.com

11
    Susan M. Coler
12  MN Bar #217621
    Nathaniel F. Smith
13  MN Bar #397276
    Halunen Law
14  80 South 8th Street, Suite 1650
    Minneapolis, MN 55402
15  Tel: (612) 605-4098
    Fax: (612) 605-4099
16  coler@halunenlaw.com
    smith@halunenlaw.com
17

18  *ATTORNEYS FOR RELATORS*

19              UNITED STATES DISTRICT COURT
20          FOR THE NORTHERN DISTRICT OF CALIFORNIA

21  [SEALED],                        Case No. 5:20-cv-00202-NC
    *ex rel.* [SEALED],
22                                   **REDACTED COMPLAINT -**
    PLAINTIFF/RELATORS               **JURY DEMAND FILED UNDER**
23                                   **SEAL PURSUANT  TO 31 U.S.C. §**
    v.                               **3730(b)(2)**
24
    [SEALED],                        **DO NOT PLACE IN PRESS BOX**
25                                   **DO NOT ENTER IN PACER**
    DEFENDANTS.
26

27

28

                        *Complaint - 1*

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

1

2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5

UNITED STATES OF AMERICA,
*ex rel.* SCOTT HAGEN AND
KEVIN KLIMASZEWSKI,

Case No. 5:20-cv-00202-NC

**REDACTED COMPLAINT**

6

PLAINTIFF/RELATORS

**JURY DEMAND**

7

8

9

v.

ADOBE SYSTEMS INCORPORATED,
CARAHSOFT, CDW GOVERNMENT,
LLC,
and EMERGENT LLC,

**FILED UNDER SEAL**
**PURSUANT  TO 31 U.S.C. §**
**3730(b)(2)**

**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER IN PACER**

10

11

12

DEFENDANTS.

13

14

15

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729, *ET SEQ.***

16

17

I.   **INTRODUCTION**

18

19

20

1.     This action is brought by Relators Scott Hagen and Kevin Klimaszewski on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* (FCA), as amended.

21

22

23

24

25

26

2.     Relators allege that Defendants Adobe Systems Incorporated, Carahsoft, CDW Government LLC ("CDW-G"), and Emergent, LLC (Emergent) (together, "Defendants") submitted or caused to be submitted false claims to the Government for computer software products and services[1] for which they charged inflated prices compared to prices charged commercial customers. These inflated prices resulted from false statements or omissions to the Government about pricing of non-Government

27

28

---

[1] For purposes of this Complaint, a reference to "products" includes Adobe software products and services.

*Complaint - 2*

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

Adobe sales. That is, Defendants sold Adobe products to commercial customers at prices significantly lower than the Government paid. In addition, for products offered through the General Services Administration Multiple Award System (GSA MAS), Defendants neither adjusted their pricing for the Government to reflect price reductions provided to commercial customers nor did Relators observe that Defendants refunded the Government for price reductions that Defendants should have retroactively provided to the Government.

3.      As a result of Defendants' false and fraudulent statements and claims, Defendants knowingly submitted and caused to be submitted false or fraudulent statements as well as claims for payment to the United States for Adobe products sold to the United States. The Government relied on Defendants' representations in agreeing to the prices it would pay for its products. Had Defendants accurately and truthfully disclosed their pricing for commercial customers, the Government would not have paid the prices it did.

4.      Relators seek to recover damages on behalf of the United States arising from Defendants' knowing violation of 31 U.S.C. 3729 § (a)(1)(A), (B), and (G).

## II.    **JURISDICTION AND VENUE**

5.      The Court has original subject matter jurisdiction over this civil matter pursuant to 28 U.S.C. §§ 1331 and 1345, as well as 31 U.S.C. § 3732(a).

6.      Venue is proper, and this District Court has personal jurisdiction over Defendants, pursuant to 28 U.S.C. § 1391 (b) and 31 U.S.C. § 3732(a), because Defendant Adobe has its principal place of business in this District and Adobe and the other Defendants transact business and committed acts proscribed by 31 U.S.C. § 3729 *et seq.* in this District.

7.      Relators are "original" sources as defined by the FCA, and no allegations set forth in this Complaint are based on public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, or from the news media.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

## III.  **PARTIES**

8.     The United States of America is the plaintiff on whose behalf Relators bring this action under 31 U.S.C. §  3729 *et seq.* The United States acts through its various agencies and departments, including the General Services Administration, and any government entity that purchases services or products from Defendants.

9.     Relator Scott Hagen is a former Adobe employee who lives in Osceola, Wisconsin.  He worked at Adobe from April 2014 through February 2018, initially as a Client Success Manager and, after two years, as a Senior Client Manager.

10.    Relator Kevin Klimaszewski lives in Delafield, Wisconsin. From April 2010 to April 2015, he worked at Adobe as a Senior Enterprise Account Executive in the Digital Marketing Retail Business Unit.

11.    Adobe Systems Incorporated, a publicly traded company, is headquartered in San Jose California. It is a diversified software company that offers computer products and services for business and personal use. Incorporated in Delaware, Adobe is publicly traded on the NASDAQ stock exchange (ticker: ADBE). Adobe does business throughout the United States, and internationally as well. Its 2018 Form 10-K reported over 21,000 employees worldwide, approximately half of whom (about 51%) work in the United States. Adobe's gross revenue for FY 2019[2] was $11.17 billion.

12.    Carahsoft, a privately held company, is headquartered in Reston, Virginia. Carahsoft describes itself as "The Trusted Government IT Solutions Provider®." Carahsoft's website says that it "serves as the master GSA and SLSA Schedule Partner for Adobe Creative, Connect, Experience Manager, and Marketing Cloud products and services, supporting an extensive ecosystem of resellers and consulting partners committed to helping government agencies optimize constituent-facing applications while automating back-end processes." Carahsoft offers an entire line of Adobe products

---

[2] Adobe's fiscal year ends on the Friday closest to November 30, resulting in a 52- or 53- week year.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

and services on GSA Schedule # GS-35F-0119Y and the SLSA Contract # EN578-100808/155/EE."[3]

13.    CDW Government LLC (CDW-G), with headquarters in Vernon Hills, Illinois, is a subsidiary of publicly traded CDW Corporation (CDW). CDW describes itself as a "leading multi-brand technology solutions provider to business, government, education and healthcare customers in the United States, the United Kingdom and Canada." It is a publicly traded (NASDAQ sticker CDW) Fortune 500 company with net sales in 2018 of over $16 billion. CDW-G offers Adobe products through GSA contract 47QTCA18D004K. From 1999-2019, it offered products through GSA contract GS-35F-0195J.

14.    Emergent, LLC, a privately held company, describes itself as an "award-winning Value Added Reseller and Open Source Systems Integrator focused on solving complex business and mission challenges on behalf of the Federal, State & Local Government Agencies, Commercial, and Higher Education." Emergent is headquartered in Vienna, Virginia. It identifies Adobe as a partner and it holds a GSA schedule (GS-35F-0119W) across all Adobe product lines.

## IV.    STATUTORY AND REGULATORY CONTEXT

### A.    The False Claims Act

15.    The FCA is "the Government's primary litigative tool" for combating schemes to fleece the government. S. Rep. No. 99-345, at 2 (1986). It is broadly drafted to reach beyond common law fraud. *Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (the FCA applies "expansively … 'to reach all types of fraud, without qualification, that might result in financial loss to the Government'") (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

---

[3] http://www.carahsoft.com/vendors/adobe

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

16.     As relevant here, the FCA imposes liability on any person who

    (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B)    knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claims; …or

    (G)    knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A), (B) (G).[4]

17.     As defined in the FCA, the terms "knowing" and "knowingly," mean that, with respect to information, a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Liability under the FCA requires no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B).

18.     The FCA further defines the term "claim" to mean any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other

---

[4] All citations are to the FCA as amended by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

19.     The FCA defines the term "obligation" to mean an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

20.     The FCA defines "material" objectively, not subjectively, to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This "natural tendency" test has long been the standard in the Ninth Circuit. *See, e.g., United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008). The Supreme Court reaffirmed the natural tendency test and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).   In determining whether a false claim or statement is "capable of influencing" the Government's decision-making process, the FCA's materiality standard looks to the effect on the likely or actual behavior of the government recipient of the misrepresentation. *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1019 (9th Cir. 2018), *cert. denied sub nom. Stephens Inst. v. United States ex rel. Rose*, 139 S. Ct. 1464, 203 L. Ed. 2d 684 (2019).

**B.     GSA Multiple Award Schedule Program**

**1.     Rationale for GSA MAS Program**

21.     Executive agencies of the United States at times need to procure products and services without going through full and open competition every time they need to make a purchase. To accommodate this need, the GSA, through the Federal Acquisition Service, has established a procedure to solicit, negotiate, award, and administer MAS contracts to procure services and products for federal agencies. *See* 41 U.S.C. § 251 *et seq.*; 40 U.S.C. § 501(b).   The MAS is also known as the "Federal Supply Schedule" (FSS).

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

22.   Historically, the GSA has negotiated multiple schedules for different types of procurement, e.g., schedules offering professional services, hardware, travel services, and leasing of automobiles and light trucks.   The GSA Information Technology (IT) Schedule 70 Contract offers IT products, services, and solutions. It is the largest of all schedules, includes more than 4,600 pre-vetted vendors, and had sales in excess of $15 billion for FY 2018.

23.   Under its MAS program, the GSA negotiates prices and contract terms with individual vendors that will apply to subsequent orders placed for all the items that are covered by the MAS contract.

24.   The list of products or services available for purchase under an MAS contract is referred to as the contract "schedule." The pre-negotiation of the terms of sale for many products and services under the MAS program saves administrative time for Government agencies ordering from the MAS and for contractors wishing to sell products to the government.

25.   The MAS program also gives the Government the benefit of procurement at prices associated with volume buying. *See* 41 U.S.C. § 259(b)(3). Contractors benefit from the MAS program because they do not have to compete in sealed bidding or negotiated acquisitions, and their products are more widely available to federal agencies under one central contract, thus making it easier for the contractors to secure revenue.

### 2.   Participation in the GSA MAS Program

26.   The Administrator of the GSA establishes the procedures that govern the MAS program, including the requirements that contractors must follow to become vendors. 40 U.S.C. §§ 121(c), 501(b)(2).

27.   Key regulations related to federal purchasing are provided in the Federal Acquisition Regulations (FAR) at 48 C.F.R. §§ 1-53.303. More specifically, regulations related to Federal Supply Schedules are provided at 48 C.F.R. § 8.4 and the General

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

Services Administration Acquisition Manual (GSAM), which contains 48 C.F.R. §§ 501.1-570.80.

28.     The GSA schedule at issue here is IT Schedule 70. To sell to the Government through this schedule, a vendor must respond to a Solicitation Document (currently Solicitation Number: FCIS-JB-980001-B). The solicitation requires a vendor to provide, among other things, a list of products, labor, and course categories along with the prices or rates for the items in the various categories. *See* 48 C.F.R. § 808.402.

29.     Interested contractors must submit responses to the solicitation according to: (1) the obligations that are outlined in the Government's solicitation; (2) the FAR and GSAM clauses that are incorporated into the contract; (3) any additional requirements negotiated between the parties; and (4) any other general contracting requirement set forth in the applicable regulations.

30.     The contract proposal is then assigned to and evaluated by a GSA Contract Specialist who collects any needed additional information, engages in negotiations, analyzes the pricing and overall proposal, and submits the final proposal for review and decision by the GSA. Once a vendor has been awarded a contract under a Schedule 70 solicitation, the rates for items or services offered in each category are deemed fair and reasonable. 48 C.F.R. § 8.404.

31.     If an MAS is awarded, the contract is assigned an FSS contract number, and the contractor is required to publish relevant information, including a price list, in three forms: (1) as an Authorized FSS Paper Price List schedule that can be distributed and posted online; (2) on the National Acquisition Center Contract Catalogue Search Tool Price List (accessible online); and (3) on the GSA *Advantage!* Electronic Price List (also accessible online).

32.     Executive agencies may then purchase services directly from vendors who appear on Schedule 70, may seek Blanket Purchase Agreements[5] (BPAs), or may issue a

---

[5] Used to fill repetitive needs for supplies or services. 48 C.F.R. 8.405-3(a)(1).

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

Request for Quotation including a Statement of Work and method of evaluation to solicit quotations from vendors.

### 3.    Required Pricing Disclosures

33.    The current solicitation for Schedule 70 (FCIS-JB-980001-B) states in its introductory materials that awards are based on a "best value" determination defined as an "expected outcome" that "provides the greatest overall benefit in response to the requirement." ("Read Me First" at 4); *see also* 8 C.F.R. § 2.101 (defining "best value").

34.    To achieve this goal, the MAS program is built around a vertical pricing model where pricing offered to the Government from a potential vendor is compared to the pricing that the same vendor offers to its commercial customers.

35.    Schedule 70, through Solicitation Clause 52.215-21 ("Solicitation" at 64), requires an offeror to prepare and submit an offer in accordance with Solicitation Clause 552.212-70. ("Solicitation" at 133-134.) That clause requires the production of the offeror's commercial descriptive catalog, or price list, from which any discount is offered. ("Solicitation" at 133.) The clause further directs that any price list specially produced for purpose of the offer must "represent a verbatim extract" from the catalog or price list underlying the document. (*Id.*) The offeror must also indicate, for each item offered, any concessions proposed that are not offered to commercial customers and any discounts offered in response to the solicitation. 552.212-70(c)(3)-(4). ("Solicitation" at 133-134.)

36.    Solicitation Clause 552.212-70(a) defines concessions and discounts as follows:

   a.    *Concession*, as used in this solicitation, means a benefit, enhancement or privilege (other than a discount), which either reduces the overall cost of a customer's acquisition or encourages a customer to consummate a purchase. Concessions include, but are not limited to freight allowance,

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

extended warranty, extended price guarantees, free installation and bonus goods.

b.   *Discount*, as used in this solicitation, means a reduction to catalog prices (published or unpublished). Discounts include, but are not limited to, rebates, quantity discounts, purchase option credits, and any other terms or conditions other than concessions [sic] which reduce the amount of money a customer ultimately pays for goods or services ordered or received. Any net price lower than the list price is considered a "discount" by the percentage difference from the list price to the net price.

("Solicitation" at 133.)

37.     Solicitation Clause 52.215-21 also requires an offeror to submit additional pricing information in a spreadsheet provided with the Solicitation or in the "Commercial Sales Practice Format" (CSP) found at Figure 515.4-2 in the GSAM at § 515.408. The spreadsheet is based on Figure 515.4-2. Included in the CSP is the commercial list price charged for each product offered, as well as information about other proposed terms and conditions. The Government further states in figure 515.4-2 that it "expects" the offeror to provide information that is "current, accurate, and complete as of 14 calendar days prior to its submission."

38.     MAS contractors who are not manufacturers of the products, but rather dealers or resellers, and which do not have significant sales to the public, must provide manufacturer's information about commercial sales of the product the MAS contractor sells to the federal government. (GSAM § 515.408(b) (at (5) in the Commercial Sales Practice Format). Such resellers must also provide the Government written authorization from the manufacturer for Government access to the manufacturer's sales records for the purpose of verifying the manufacturer's information. *Id.*

*Complaint* - 11

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

### 4.    Evaluation of Pricing Information

39.    Pursuant to GSAM § 538.270-1(a), contracting officers are required to use the provided "evaluation methodology for negotiating MAS offers when the commercial sales practices format is included in the solicitation (see 515.408)." That methodology includes a goal that the Government "will seek to obtain the offeror's best price (the best price given to the most favored customer)" although "there may be legitimate reasons why the best price is not achieved." (*Id.*; GSAM § 538.270-1(c).)

40.    When determining the reasonableness of a price, the contracting officer is directed to "compare the terms and conditions of the MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers." (*Id.*, GSAM § 538.270-1(e).) In negotiating the terms of an MAS contract, government contracting officers therefore rely heavily on the accuracy and truthfulness of the information provided by the offeror regarding its commercial sales.

41.    The importance of providing truthful and accurate information is reinforced by the inclusion of a penalty provision in the MAS contract—GSAM § 552.215-72, which is incorporated into the Schedule 70 Solicitation at Solicitation Clause 552.212-72 ("Solicitation" at 136.) That penalty clause states that the Government is entitled to a reduction in the price of each order issued pursuant to the MAS contract if, after the formation of the contract, the Government discovers that the prices in a contract or modification were inflated due to the contractor's failure to provide current, accurate, and complete information, or to update that information. (*Id.*) The amount of the reduction is the amount by which the Government orders were inflated because of the inaccurate or undisclosed information. (*Id.*) Besides any other available remedies, the penalty clause further states that "the Government may terminate this contract for default." *Id.*

### 5.    Operation of Price Reductions Clause

42.    The Schedule 70 solicitation also incorporates Solicitation Clause 552.238-75 regulations related to price reductions. ("Solicitation" at 145-146.) This "Price

*Complaint* - 12

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

Reductions Clause" (PRC) requires the offeror and contracting officer to agree on: (1) a basis-of-award customer; and (2) the Government's price or discount relationship to that customer. (*Id.*, *see also* GSAM § 552.238-75(a).) "Any change in the contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction." ("Solicitation" at 145.)

43.     Under the terms of the PRC at GSAM § 52.238-75(c)(1), a price reduction occurs if the contractor:

(i)     Revises the commercial catalog, pricelist, schedule or other document upon which the contract award was predicated to reduce prices;

(ii)    Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which the contract award was predicated; or

(iii)   Grants special discounts to the customer (or category of customers) that formed the basis of the award, and the change disturbs the price/discount relationship of the Government to the customer that was the basis of the award.

("Solicitation" at 145.)

44.     When a price reduction to the benefit of the basis-of-award commercial customer occurs, the contractor must offer the same price reduction to the Government, with the same effective date and for the same time period; this must occur within 15 days of the effective date of the price reduction. (*Id.* at 146.)

45.     In short, a business that has products listed in a GSA Section 70 Multiple Award Schedule is obligated to provide accurate and truthful information to get on the schedule. Information about prices and terms offered to commercial customers is critical

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

to this process. Once a product is on the schedule, a contractor is further required to offer the Government reductions in prices consistent with offers made to commercial customers. This is to ensure that the Government is receiving a "best value" sufficient to justify eliminating any further full and open competition with respect to the product. 48 C.F.R. § 2.101.

### C.     Other Government Procurement of Commercial Items

46.     Rules and procedures for acquisition of commercial items not purchased through a GSA MAS are provided in FAR Part 12. *See* 48 C.F.R. §§ 12.000 *et seq.*[6] FAR Parts 13 through 15 apply those rules and procedures to particular types of contracts. Relevant here are regulations related to simplified acquisitions, *see* 48 C.F.R. 48 §§ 13.100 *et seq.*, and negotiated contracts, *see* 48 C.F.R. §§ 15.000 *et seq.*

47.     The regulations define a "commercial item" as:

> Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and –
>
> (i)     Has been sold, leased, or licensed to the general public; or
>
> (ii)    Has been offered for sale, lease, or license to the general public[.]

48 C.F.R. § 2.101.

48.     The regulations further define a "commercially available off-the-shelf" item as a "commercial item" that is sold in the commercial marketplace "in substantial quantities," and is sold to the Government "without modification." 48 C.F.R. § 2.101.

49.     When seeking to purchase commercial items through means other than a GSA MAS, a Contract Officer "must establish price reasonableness" before the purchase

---

[6] DoD acquisitions are also subject to regulations in the Defense Acquisition Regulation Supplement (DFARS). *See* DFARS 201.104.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

is made. 48 C.F.R. § 12.209. That is, the "fair and reasonable" standard used for the GSA MAS process also applies here, except that it applies to individual transactions.

50.     The regulations do not allow a Contract Officer to rely on a price list or catalog price as the basis for a "fair and reasonable" determination: [t]he fact that a price is included in a catalog does not, in and of itself, make it fair and reasonable." 48 C.F.R. § 15.403-3(c); *see also*, 48 C.F.R. § 13.106-3(a)(2)(iii) (same).

51.     Under the simplified acquisition process, a Contract Officer's determination that a price is "fair and reasonable" is preferably based on "competitive quotations or offers," but a Contract Officer may also use market research, price lists, or "any other reasonable basis." 48 C.F.R. § 13.106-3(a).

52.     For negotiated contracts, a Contract Officer's determination that a price is "fair and reasonable" must be based on a "price analysis." 48 C.F.R. § 15.403-3(c)(1). The Contract Officer must document this determination with a Price Negotiation Memorandum (PNM). 48 C.F.R. § 406-3(a). When a price analysis is used, the PNM must include a "summary of the contractor's proposal" in the contract file, as well as "the source and type of data used to support the determination." 48 C.F.R. § 406-3(a)(7).

53.     At a minimum, a price analysis typically[7] consists of obtaining "appropriate data, without certification, on the prices at which the same or similar items have previously been sold and determin[ing] if the data is adequate for evaluating the reasonableness of the price."  48 C.F.R. § 15.404-1(b)(1). Analysis techniques also include comparing "proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items," as well as comparing "discount or rebate arrangements." 48 C.F.R. § 15.404-1(b)(2)(ii) and (iii).

---

[7] Two exceptions apply. *See* 48 C.F.R. § 15.404-1(b) (price analysis not required if prices are based on adequate price competition or on prices set by law or regulation).

*Complaint* - 15

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

**V.    FACTS UNDERLYING RELATORS' CLAIMS**

**A.    Adobe's Business**

54.    Adobe is a United States-based multinational company.

55.    Adobe's business is organized into three reportable segments: Digital Media, Digital Experience, and Publishing. Adobe identifies Digital Media and Digital Experience segments as strategic growth areas.

56.    As shown in the chart and discussed in the paragraphs below, the Digital Media and Digital Experience segments include what are designated as cloud-based products offered as a Software-as-a-Service or managed services model.

| Adobe Business Segments | Components |
|---|---|
| Digital Media | Adobe Creative Cloud - creative products<br>Adobe Document Cloud - Acrobat products |
| Digital Experience | Adobe Experience Cloud - includes<br>Adobe Advertising Cloud<br>Adobe Analytics Cloud<br>Adobe Marketing Cloud<br>Magento Commerce Cloud |
| Publishing | Legacy products and services - include eLearning solutions, technical document publishing, web conferencing, document and forms platform, web application development and high-end printing |

57.    Adobe's Digital Media business generates about 70% of its total revenue. Within that segment is what is called Adobe Creative Cloud, which encompasses Adobe's collection of desktop and mobile apps and services for design, photography, web/UX, and video. The Creative Cloud further provides templates and online services to sync, store, and share files, and create apps and websites. Adobe views the Creative Cloud as addressing the needs of creative professionals (e.g., artists, designers,

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

developers, students and administrators) who use the products for such purposes as publishing, web design and development, videos, mobile apps and gaming, and creation of documents.

58.    Adobe's Document Cloud business is also within the Digital Media segment. It is built around the Adobe Acrobat products and integrated cloud-based document services, as well as Adobe Sign for automating manual signing processes.

59.    Adobe's Digital Experience segment generates about 27% of its total revenue. This segment of Adobe's business encompasses the Experience Cloud, which enables Adobe to help businesses personalize and optimize content and experience in a consumer's digital interactions. It does this by providing analytics, targeting, advertising optimization, digital experience management, marketing automation and engagement, cross-channel campaign management, content management, asset management, audience management, premium video delivery, digital commerce enablement, order management, predictive intelligence and monetization. This Cloud consists of Advertising, Analytics, Marketing, and Magento Commerce Clouds.

60.    Lastly, Adobe's Publishing segment generates about 3% of its total revenue. It includes what Adobe categorizes as legacy products and services, such as eLearning solutions, technical document publishing, web conferencing, document and forms platform, web application development and high-end printing.

**B.    Adobe Compliance**

61.    The "Adobe Code of Business Conduct" (Code) "outlines the principles that guide [its] interactions with employees, customers, partners, stockholders, and communities."[8] The Code includes sections on conflicts of interest, fair dealing in business relationships, anti-corruption compliance and compliance with the law. The

---

[8] https://www.adobe.com/content/dam/acom/en/corporate-responsibility/pdfs/code-of-conduct-ext.pdf at p. 1 of 13.

principles are further articulated in a series of documents that appear to be published only internally.

62.     Adobe's Code identifies all personnel as being responsible for complying with the Code. It directs managers to monitor compliance and provides various means for employees to report violations, including a hotline. Adobe further identifies its Compliance Office as the entity responsible for maintaining and enforcing the standards and procedures in the Code, including investigating potential violations.

63.     The Code includes a specific section titled "Working with Government Customers."[9] That section recognizes that "Adobe is subject to unique requirements that are considerably stricter when a government entity is our customer or ultimate end customer (such as when Adobe performs as a subcontractor) than when we work with commercial customers." It further references a separate U.S. Public Sector Handbook as addressing specific requirements applicable to business transactions with the U.S. public sector, as well as any prime contractors for any government entities.[10] In addition, Adobe warns employees that they are responsible for knowing any specific requirements that apply to their work with a government entity.

## C.     Adobe Sales

### 1.     Overview

64.     Adobe markets and licenses its products directly through a sales force and certain local offices, as well as its website at www.adobe.com.

65.     Adobe also uses sales channels for marketing and distributing its products, including distributors, retailers, software developers, systems integrators (SIs), independent software vendors (ISVs), and value-added resellers (VARs). In addition,

---

[9] https://www.adobe.com/content/dam/acom/en/corporate-responsibility/pdfs/code-of-conduct-ext.pdf at § 5.4, p. 9 of 13.
[10] The Code indicates that it is posted on Inside Adobe at https://inside.corp.adobe.com/corporate-policies.html.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

Adobe sales occur through original equipment manufacturers (OEMs) and hardware bundle customers.

66.    Adobe uses a software subscription model for the sale of a majority of its products. The subscription gives customers access to a product for a specific time period, and it further licenses perpetual versions of its software with maintenance and support.

67.    For purposes of government contracting, Adobe's products are considered commercial and commercial-off-the-shelf products as defined in the regulations.

68.    The Adobe sales force was divided into several groups: financial services, retail and healthcare, travel and hospitality, and public sector (government).

69.    The sales force typically met as a whole only one time a year at an annual December sales kickoff meeting. Each business unit typically had separate quarterly business reviews.

70.    The sales force responsible for government business operated separately from the other groups, which were engaged in commercial sales.[11] The separation functioned as a type of "government firewall" making it less likely that government sales people would be aware of pricing deals offered to commercial customers.

71.    Adobe provided a price list to its salespeople who work with its commercial customers.[12] The list included tiers of discounting. The commercial sales people were given discretion to negotiate pricing, usually up to a ██% discount of the list price, but all sales contracts had to go through the "deal desk" before they could be executed. Generally, the commercial sales people could not exceed a ██% discount, but if deals were big enough, even that discount could be exceeded if the deal desk approved.

72.    Adobe tracked its sales in a database called SalesForce. Account managers who worked in Digital Experience/Marketing Cloud were trained to extract data from SalesForce using a tool called "Compiled Feedback." This tool allowed the account

---

[11] The term "commercial sales" in this Complaint refers to non-government sales.
[12] Ernst & Young regularly audited this price list.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

managers to extract pertinent information about contracts and renewals for which they were responsible, into an easy, readable format, such as Excel. For comparison purposes, Compiled Feedback also allowed an account manager to see data about other contracts and renewals.

## 2.   Adobe Sales to the Government

73.     Adobe's SEC Form 10-K identifies the U.S. federal government as a customer. However, it provides little additional information or data about its business with the Government and does not indicate what proportion of Adobe's revenue is derived from government sales.

74.     A large proportion of government sales occur in the Digital Media (Creative and Document Clouds) segment of Adobe's business. This is not surprising, given the size of the Government and its need to utilize publications, forms, and documents in its operations.

75.     However, Adobe's website promotes the expansion of government purchases in the Digital Experience/Experience Cloud. Adobe's website emphasizes use of its experience-driven digital technology for public services as a means of engaging government constituents in digital interactions backed by the Adobe Experience Cloud. The website further emphasizes government sales related to defense and national security, federal government, and state and local government, with a focus on the needs of government agencies to engage the public through "exceptional digital experiences." Additional web content explains purchasing options for the Government, including various kinds of licensing agreements.

76.     Third-party resellers sell most of Adobe's products to the Government.

77.     The Federal Procurement Data System Next Generation (FPDS-NG) database indicates Adobe sales to the Government amounting to $853,386,483.38 for the

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

period from January 1, 2009 through December 1, 2019.[13] Of the 11,736 entries, 81.6% have a Reference IDV (indefinite delivery vehicle) number. An IDV is a contract "awarded to one or more vendors to facilitate the delivery of supply and service orders" and "is established by an award from the FSS, GWAC [government wide acquisition contract], BOA [basic ordering agreement], etc."[14]

78.     About half of Adobe's sales to the Government occur through third-party resellers who provide products through the GSA MAS. The table below identifies 13 vendors currently listed as <u>selling</u> Adobe products in the GSA Advantage eLibrary.[15] The chart below shows the amount of <u>actual</u> sales for each vendor for the 10-year period from January 1, 2009 through October 2019.[16] The chart is based on an FPDS-NG search using the DUNS number of each reseller and "Adobe." The column stating "Date of First Sale/Date Signed" provides the date of the initial transaction with that particular reseller, and thus indicates the length of its relationship with Adobe.

**Resellers of Adobe Products – 1/1/2009-9/24/2019**

| DUNS # | Schedule Contractor | All Contract #'s Total Sales since 2009 | Sale Dates 2009 - Present | Date of First Sale/Date Signed | Last FPDS Search Date |
|---|---|---|---|---|---|
| 619645745 | American Business Solutions, Inc. | No Sales Found | N/A | N/A | N/A |
| 132646675 | Arrow Micro Corp. | ($21,201.70) | 01/16/2019 | 08/17/2010 | 10/03/2019 |

---

[13] This amount was derived from a November 27, 2009 search using "Adobe" as the keyword, limiting the time from to January 1, 2009 to the present, and calculating the sum of the "Action Obligation" field (Column F).

[14] https://www.fpds.gov/help_V1_0/Indefinite_Delivery_Contract.htm

[15] https://www.gsaelibrary.gsa.gov/ElibMain/mfrList.do?scheduleNumber=70&searchMethod=autonomy

[16] This list may underrepresent sales because it only captures transactions where "Adobe" appears in the data for the transaction.

*Complaint* - 21

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

| DUNS # | Schedule Contractor | All Contract #'s Total Sales since 2009 | Sale Dates 2009 - Present | Date of First Sale/Date Signed | Last FPDS Search Date |
|---|---|---|---|---|---|
| 88365767 | Carahsoft Technology Corporation | $207,066,885.45 | 01/07/2009 - 10/07/2019 | 03/01/2001 | 10/08/2019 |
| 026157235 | CDW Government LLC | $136,147,230.78 | 01/07/2009 - 09/27/2019 | 04/09/2003 | 10/03/2019 |
| 877936518 | Dell Marketing L.P. | $17,183,992.56 | 02/17/2009 - 05/08/2019 | 05/12/2016 | 10/08/2019 |
| 134898316 | EC America, Inc. | No Sales Found | N/A | 06/30/2004 | N/A |
| 781797712 | Emergent, LLC | $96,797,377.10 | 04/10/2009 - 09/03/2019 | 10/01/2007 | 10/8/2019 |
| 809678782 | Gov-connection Inc. | $5,933,185.21 | 01/22/2009 - 09/04/2019 | 03/22/2004 | 10/08/2019 |
| 159776806 | Insight Public Sector, Inc. | $12,468,211.72 | 02/02/2009 - 06/13/2019 | 10/20/2003 | 10/03/2019 |
| 25155135 | Amananet, Inc. | No Sales Found | N/A | N/A | N/A |
| 611429481 | Shi International Corp. | $13,062,556.90 | 03/10/2009 - 09/03/2019 | 06/26/2006 | 10/03/2019 |
| 166903521 | Computer Solutions East, Inc. | No Sales Found | N/A | N/A | N/A |

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

| DUNS # | Schedule Contractor | All Contract #'s Total Sales since 2009 | Sale Dates 2009 - Present | Date of First Sale/Date Signed | Last FPDS Search Date |
|---|---|---|---|---|---|
| 129365420 | PCMG, INC. | $541,768.40 | 01/22/2009 - 04/11/2019 | 07/07/2005 | 10/03/2019 |
| | TOTAL: | $489,180,006.42 | | | |

79.    The FPDS-NG data above shows that Defendants Carahsoft, CDW-G, and Emergent are, respectively, the three largest third-party resellers for Adobe in terms of dollars.

80.    Although government purchases in the FPDS system were often listed as sold by resellers to the Government, those deals were typically first negotiated by Adobe sales persons, and then approved by Adobe. That is, Adobe controlled the pricing. Once the deal was negotiated and approved, the contract terms were handed over to a reseller partner such as Carahsoft, which then completed the transaction with the government entity making the purchase.

### 3.    Direct Sales to Federal Government

81.    Adobe has its own DUNS number:   102096559. For the time period January 1, 2009 through November 30, 2019, the FPDS-NG database shows 82 transactions directly involving Adobe as the "vendor." Those transactions involve multiple NAICS numbers and multiple agencies. The "action obligation" total amount of those transactions for that time period is $5,481,136.31.

### D.    Relators' Knowledge of Adobe's Government Sales Practices

82.    In April 2014, Relator Scott Hagen began working at Adobe as a Client Success Manager. Two years later (February 2016), he was promoted to Senior Client Success Manager. He held that title until he left Adobe in February of 2018. At Adobe, Hagen was a main executive point of contact for retail Digital Experience/Marketing

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

Cloud customers and was responsible for growing and ensuring customer satisfaction with their use of highly sophisticated Adobe products across various customer business units and organizations. A significant component of Relator Hagen's position involved working with customers' renewal of their contracts with Adobe.

83.    Relator Kevin Klimaszewski, was a Senior Enterprise Account Executive in Adobe's Digital Marketing Retail Business Unit for five years, from April 2010 to April 2015. In this position Klimaszewski sold high-end analytics to commercial customers. His tenure at Adobe overlapped Relator Hagen's for about a year (April 2014-April 2015), and Hagen supported Klimaszewski's post-sales work.

### 1.    Adobe Failed to Ensure the Government Received "Fair and Reasonable" Pricing as Compared to Commercial Customers

84.    Relators were familiar with the principle that companies doing business with the Government had to treat it fairly in terms of pricing. In conjunction with this principle, they understood that sales operations/compliance personnel (e.g. "deal desk") should typically check commercial sales proposals against amounts charged for government sales to be sure that commercial customers were not treated more favorably than the government.

85.    In conjunction with his job, Relator Hagen had access to the "Compiled Feedback" tool which allowed him access to information about Adobe Marketing Cloud contracts going back multiple years, including links to government contracts in SalesForce. He reviewed prior contracts in Compiled Feedback to see how Adobe had priced a particular product to various customers.

86.    When reviewing prior contracts, Relator Hagen noticed, in particular, that Adobe had not given the Government discounts that commercial customers routinely received, resulting in the Government paying significantly higher prices for products than those commercial customers.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

87.     Relator Hagen further compared the prices for Adobe products on the GSA Schedule 70 with those offered to commercial customers and noted that prices for commercial customers were substantially discounted as compared to the GSA schedule. He observed that these discrepancies occurred on the Digital Experience side of the business where he worked, but were even more pronounced on the Digital Media/Creative Cloud side of the business, which represents about 70% of Adobe's business.

88.     Relator Hagen consulted with Relator Klimaszewski, whose observations of how Adobe did business with the Government was consistent with Relator Hagen's. Based on positions he held before working at Adobe, Relator Klimaszewski assumed that companies, including Adobe, were obligated to give the Government pricing opportunities like those offered in the commercial sphere.

89.     In the five years that Relator Klimaszewski worked at Adobe, he never observed this process happening at Adobe with respect to government pricing. He was never asked whether any of his deals involved the Government. He was never told that his deals could not go lower than pricing offered to the Government. This included work in both the Marketing and Creative Clouds.

90.     Relator Klimaszewski was also aware that, even where third-party resellers were involved, Adobe sales persons negotiated the government deals and received Adobe approval for those deals. Adobe then turned over the transaction for the third-party reseller to execute the sale.

91.     Neither Relator was aware that Adobe gave any sales persons training on whether and how government pricing impacted the prices they could negotiate with commercial customers.

92.     Neither Relator observed any instance where commercial pricing resulted in a refund to a government customer that had been charged a higher price for a product than a commercial customer.

*Complaint* - 25

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

### 2.   Adobe Charged the Government Higher Prices than Charged to Commercial Customers for the Same Products

93.   Below are examples of sales demonstrating that Adobe sold products and services to the Government at prices higher than those offered to commercial customers.

#### a.   Adobe Analytics (Digital Experience Segment)

94.   Adobe Analytics products provide "reporting, visualizations, and analysis of Customer Data that allows Customers to discover actionable insights."[17] Pricing is primarily based on "server calls," which mean "each page view, exit link, download, customer link, or other event on the Customer Site(s) to the extent that Customer tags, allows to be tagged, or causes to be tagged such page views, exit links, downloads, custom links, and other events for purposes of accessing and using Adobe Analytics."[18]

95.   The Adobe Analytics products are generally purchased through an annual contract providing for a designated number of server calls per month. Typically, with retail/commercial customers the rate decreased when the allowed volume of server calls increased.[19] When a contract was due for renewal, additional negotiations occurred based on the prior year's volume. Sometimes those negotiations included adjustments for the subsequent year based on the accuracy of the estimation of calls compared to the actual usage of them.

96.   Carahsoft sells Adobe Analytics: OD (SKU 38051945) through GSA Advantage, which lists the following prices based on quantity of calls purchased:

---

[17] https://helpx.adobe.com/legal/product-descriptions/adobe-analytics.html
[18] *Id.*
[19] Renewal of the contract includes an evaluation of volume usage, with adjustments/negotiations based on whether usage is flat or over/under the contracted call volume.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

**Table 1 - GSA Advantage Carahsoft Listings for Adobe Analytics OnDemand**

| Qty/Millions/Billions | Unit Price per Million per Month | Annual Price | SKU |
|---|---|---|---|
| 1-1.5 M calls per month | $2,431 | $29,168.25 | 38051945.1 |
| 1.5-2 M calls per month | $1,728 | $31,104.11 | 38051945.15 |
| 2-2.5 M calls per month | $1,393 | $33,442.35 | 38051945.2 |
| 2.5-5 M calls per month | $1,994 | $59,815.61 | 38051945-2.5 |
| 5-10 M calls per month | $1,468 | $88,092.08 | 38051945.5 |
| 10-13.5 M calls per month | $744 | $89,266.65 | 38051945.10 |
| 13.5-35 M calls per month | $1,276 | $206,690.14 | 38051945-13.5 |
| 35-50 M calls per month | $527 | $221,317.78 | 38051945-35 |
| 50-75 M calls per month | $485 | $291,193.30 | 38051945-50 |
| 75-100 M calls per month | $372 | $334,967.45 | 38051945-75 |
| 100-150 M calls per month | $377 | $451,879.80 | 38051945-100 |
| 150-200 M calls per month | $289 | $519,852.09 | 38051945-150 |
| 200-300 M calls per month | $292 | $701,474.05 | 38051945-200 |
| 300-500 M calls per month | $281 | $1,011,427.71 | 38051945-300 |
| 500 M – 1 B calls per month | $283 | $1,696,588.41 | 38051945-500 |
| 1-2 B calls per month | $227 | $2,718,891.69 | 38051945-1000 |
| 2 B+ calls per month | $190 | $4,567,738.04 | 38051945-2000 |

*Complaint - 27*

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

97.    The table below shows SalesForce data for two commercial purchases of the same analytics product. The commercial customers paid prices per unit substantially smaller than those listed on the FSS for government purchasers. In fact, even if the government purchased up to 2 billion calls, its listed unit price ($226) was higher than the commercial entities paid for far fewer calls.

**Table 2 – Adobe Analytics: OD (SKU 38051945) – Actual <u>Commercial</u> Sales**

| Entity Start/End Date | Qty (Millions/Billions | Unit Price per Million per month | Annual Price | SKU |
|---|---|---|---|---|
| ████████ | ██████ | ██████ | ████████ | 38051945 |
| ████████ | ████ | ████ | ██████ | 38051945 |

Comparing the price for government sales from 75-100 million calls per month ($372) with the two commercial prices, which were in the same category for quantity, the differences are:

- ████████████████████████  The government price was ███████████ ████ as ████ paid.
- ███████████████████████  The government price was almost ███████████ than ██████ paid.

98.    Additional contracts for Adobe Analytics that were comparable in volume and time frame also demonstrate significant price differentials between sales to the Government and commercial customers.

99.    Tables 3 and 4 below show sales of Adobe Analytics: OD [On Demand] (SKU 38041945). All of the involved government contracts were sold through Carahsoft, although, as discussed in paragraphs 80 and 90 above, Adobe sales personnel negotiated

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

the contracts, which Carahsoft then executed. The tables show that the Government was paying more per million calls than commercial entities, even when purchasing more server calls. Put another way, the Government received discounts in a significantly smaller proportion than commercial customers did.

**Table 3 - Adobe Analytics: OD (SKU 38051945) – Actual <u>Government</u> Sales**

| Entity Start/End Date | Qty/ Millions | Unit Price per Million per Month | Annual Price | SKU | Contract |
|---|---|---|---|---|---|
| ███ | █ | ███ | ███ | 38051945 | ███ |
| ███ | ██ | ██ | ███ | 38051945 | ███ |
| ███ | ██ | ██ | ███ | 38051945 | ███ |
| ███ | ██ | ██ | ███ | 38051945 | ███ |

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

**Table 4 - Adobe Analytics: OD (SKU 38051945) – Actual <u>Commercial</u> Sales**

| Entity Start/End Date | Qty/ Millions | Unit Price per Million per Month | Annual Price | SKU | Contract |
|---|---|---|---|---|---|
| ███████ | █ | ████ | █████ | 38051945 | █████ |
| ███████ | ███ | ████ | █████ | 38051945 | ███████ |

100.  Tables 5 and 6 below show sales of Adobe Analytics Standard with SKU 3804932, which is essentially the same product as SKU 38041945. These government purchases also occurred through Carahsoft. The tables show that the Government paid more per million calls than commercial customers even when purchasing more server calls. As with SKU 38041945, the Government discounts were significantly smaller than those offered to commercial customers.

**Table 5 -Adobe Analytics Standard (SKU 38049432) – Actual <u>Government</u> Sales**

| Entity Start/End Date | Qty/ Millions | Unit Price per Million per Month | Annual Price | SKU | Contract |
|---|---|---|---|---|---|
| ███████ | █ | ████ | █████ | 38049432 | █████ |
| ███████ | ███ | ████ | █████ | 38049432 | █████ |

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

**Table 6 -Adobe Analytics Standard (SK 38049432) – Actual <u>Commercial</u> Sales**

| Entity Start/End Date | Qty/ Millions | Unit Price per Million per Month | Annual Price | SKU | Contract |
|---|---|---|---|---|---|
| ▮▮▮▮▮ | ▮ | ▮▮▮ | ▮▮▮ | 38049432 | ▮▮▮▮ |
| ▮▮▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | 38049432 | ▮▮▮▮ |
| ▮▮▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | 38049432 | ▮▮▮▮ |
| ▮▮▮▮▮ | ▮ | ▮▮▮ | ▮▮▮ | 38049432 | ▮▮▮▮ |
| ▮▮▮▮▮ | ▮ | ▮▮▮ | ▮▮▮ | 38049432 | ▮▮▮▮ |
| ▮▮▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | 38049432 | ▮▮▮▮ |
| ▮▮▮▮▮ | ▮ | ▮▮▮ | ▮▮▮ | 38049432 | ▮▮▮▮ |
| ▮▮▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ | 38049432 | ▮▮▮▮ |

101.   For the purchases in Tables 3 and 5 above, the Government paid less per million calls than the price for that quantity shown in the GSA Advantage listing in Table 1. However, to the extent that some discounting occurred for the Government, the

*Complaint* - 31

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

discounts were not as deep as those offered commercial customers. All of these purchases occurred through Carahsoft.

102.    Another way that Adobe favored commercial customers over the Government was that Adobe would roll several "accounts" into one contract for larger customers, thereby providing a basis to sell the product at a much lower price based on volume. In contrast, Adobe tended to write single contracts for individual government projects, thus depriving the Government of larger volume pricing.

103.    When commercial customers had experienced an overage of server calls in a prior year, it was common for Adobe to ██████████████████████████ ████████████████████████████████. Relator Hagen is not aware that Adobe disclosed or offered █████████████ to the Government.

### b.    Access Training Pass-Named User (SKU 38052384) (Digital Experience Segment)

104.    The Access Training Pass-Named User (SKU 38052384) authorized a single named user "to enroll and attend an unlimited number of public virtual or regional classroom training courses" during the relevant period at a list price of $████ per person per year. As of November 17, 2019, Carahsoft sold this product on GSA Advantage for $4,785.89. This is a discount of $████ or ███%.

105.    Table 7 below shows sales of the Access Training Pass-Named User in FY 2017, including four government sales. Of the transactions for FY 2017, three government agencies directly purchased the pass at $████. Of the 21 transactions that were less than $████, only one involved a government agency, which purchased the product through Carahsoft. The discount for that agency was minimal and the smallest of the 21. The second lowest discount was for an entity that is an eligible GSA user. The discounted transactions for commercial purchasers had significantly higher discounts, which do not appear to be related to the number of passes purchased.

*Complaint - 32*

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

**Table 7 - Access Training Pass-Named User (SKU 38052384) – Actual <u>Government</u> and <u>Commercial</u> Sales**

| Government (G) Commercial (C)[20] | Actual Sale Price (list price: ███) | Amount of Discount per Pass | Number of Passes Purchased in Transaction | Number of Transactions |
|---|---|---|---|---|
| G (████) | ███ | | 1 | 1 |
| G (████) | ███ | | 1 | 1 |
| G ██████ | ███ | | 1 | 1 |
| C | ████ | ████ | 2 | 1 |
| C | ███ | ███ | 1 | 5 |
| C | ███ | ███ | 2 | 1 |
| C | ███ | ███ | 3 | 3 |
| C | ███ | ███ | 5 | 1 |
| C | ███ | ████ | 6 | 2 |
| C | ████ | ███ | 2 | 1 |
| C | ███ | ███ | 4 | 1 |
| C | ███ | ███ | 7 | 1 |
| C | ███ | ███ | 1 | 1 |

---

[20] Relator can identify the commercial customers, on request.

*Complaint - 33*

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

| Government (G) Commercial (C)[20] | Actual Sale Price (list price: $■■■) | Amount of Discount per Pass | Number of Passes Purchased in Transaction | Number of Transactions |
|---|---|---|---|---|
| C | ■■■ | ■■■ | 2 | 1 |
| C | ■■■ | ■■■ | 15 | 1 |
| Eligible GSA User | ■■■ | ■■■ | 1 | 1 |
| G (■■■) | ■■■ | ■■■ | 3 | 1 |

**c.     AEM    Mobile    (SKU    10006362/38052698)    (Digital Experience   Segment)**

106.    The    Adobe    Experience    Manager    (AEM)    Mobile    (SKU 10006362/38052698[21]) is a solution for building and managing enterprise mobile apps.[22] It is sold on a base unit per year basis.

107.    Carahsoft sells the AEM Mobile product with SKU 38052698 through GSA Advantage at a price of $135,944.58. The product is described as: "Adobe Experience Manager Mobile Single- Single App License – 12 Month Term." Carahsoft also sells an AEM Mobile OnPremise Single App License – 12 Months with SKU 38052698JA[23] for the same price.

108.    Tables 8 and 9 below show sales of AEM Mobile base unit, including two sales to the Government. These government purchases occurred through Carahsoft. As

---

[21] In Compiled Feedback, the SKU was typically 10006362, but, in at least one instance, appeared as 38052698 in SalesForce.
[22] https://www.adobe.com/content/dam/acom/en/marketing-cloud/enterprise-content-management/pdfs/54658.en.aem-mobile.brief.using-aem-content-management.pdf
[23] With the On-Premises option the customer uses its own server.
https://www.adobe.com/content/dam/acom/en/security/pdfs/aem-mobile-security-overview.pdf at 2.

*Complaint* - 34

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

1 | shown in Table 9, at least seven commercial customers purchased the same product at a
2 | much deeper discount.

**Table 8 – AEM Mobile: OPT Single (SKU 1006362/387052698)
– Actual <u>Government</u> Sales**

| Entity | Amount Per Unit | SKU | Contract |
|---|---|---|---|
| ███████████ | ████ | 10006362 | ████████ |
| ████████████ | ████ | 38052698 | ████████ |

**Table 9 – AEM Mobile: OPT Single (SKU 1006362/387052698)
– Actual <u>Commercial</u> Sales**

| Entity | Amount Per Unit | SKU | Contract |
|---|---|---|---|
| ██████████ | ████ | 10006362 | ██████ |
| ██████████ | ████ | 38052698 | ██████ |
| ████████████ | ████ | 10006362 | ██████ |
| ██████ | ████ | 38052698 | ██████ |
| ███████████ | ████ | 10006362 | ██████ |
| ████████ | ████ | 10006362 | ██████ |
| █████████ | ████ | 10006362 | ██████ |

109.   For the purchases in Table 8 above, the Government paid less per unit than
the price provided in the GSA Advantage listing. However, commercial customers paid
even less per unit than the Government.

*Complaint - 35*

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

**d.    Premium Service –SW (SKU 38051853) (Digital Experience  Segment)**

110.    Adobe's Premium Service –SW (SKU 38051853) provides the services of a Technical Account Manager (TAM) for one year at a list price of $█████/year. GSA Advantage lists three sellers of this SKU at essentially the same price, about $57,450: Defendant Carahsoft ($57,454.91), EC America, Inc. ($57,430.73), and Defendant Emergent, LLC ($57,460.96).

111.    In the time period of 2013-2014, commercial customers were often given this resource for free. However, by mid-2015, a business decision was made to routinely charge for this service and to sell it more vigorously.

112.    Tables 10 and 11 below identify 17 contracts booked and sold for less than the list price per year. Of these 17 contracts, three were with government agencies that purchased through Carahsoft and paid the GSA price (or more). Of the remaining 14 contracts, only one commercial customer paid more than the GSA price, and 13 paid less.

**Table 10 - Premium Service –SW (SKU 38051853) – Actual <u>Government</u> Sales**

| Entity | Price per Year | Service End Date |
|--------|----------------|------------------|
| ███████ | ████ | ████ |
| ████████ | ████ | ████ |
| █████████ | █████ | ████ |

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

**Table 11 - Premium Service –SW (SKU 38051853) – Actual <u>Commercial</u> Sales**

| Entity | Price per Year | Service End Date |
|--------|----------------|------------------|
| ███████████ | █████ | ███████ |
| ████████████████ | █████ | ██████████ |
| ██████ | █████ | ███████ |
| █████████ | █████ | ███████ |
| ███████ | ██████ | ██████ |
| █████████████ | ██████ | ███████ |
| ███████ | ██████ | █████████ |
| ██████████████████ | ██████ | █████████ |
| ████████ | █████ | █████████ |
| █████████ | █████ | █████████ |
| ███████ | █████ | █████████ |
| ████████████████████ | █████ | ████ |
| ███████████ | █████ | ████████ |
| █████████████ | █████ | ███████ |

113.    Adobe also engaged in other arrangements that had the effect of giving commercial customers this service at a discounted or free price. For example, in an invoice for one commercial customer, the Premium Service-SW was shown as booked at its list price. However, a review of the entire contract shows discounts on another SKU that added up to the price of the Premium Service-SW. Communications relating to this

*Complaint - 37*

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

negotiation made it clear that the intent of the one-time discounts was to provide the service free for a year.

e.    **Creative Cloud Enterprise All MLP SW Subscription Only  (SKU 65227749/65257924/10006960) (Digital Media Segment)**

114.    The Creative Cloud Enterprise All MLP SW Subscription Only (SKU 65227749/65257924/10006960) is a subscription to use multiple products in the Creative Cloud for one year. The first two SKUs are essentially the same, except for differences relating to billing frequency, service, and storage levels. The third SKU is a similar, but better product. None of the three SKUs discussed in this section is listed on GSA Advantage.

115.    Tables 12 and 13 below identify four contracts under SKU 65227749. Although the government customer purchased many more units, it received no discount when compared to commercial customers, and in fact paid a price per unit slightly higher than commercial customers that purchased far fewer units.

**Table 12 – Creative Cloud Ent ALL MLP SW Subscription Only Mun 1S Complete 2G (SKU 65227749) – Actual <u>Government</u> Sale**

| Entity | Qty | Unit Price | Total Price | Dates |
|--------|-----|------------|-------------|-------|
| ███ | █ | █ | ███ | █████ |

**Table 13 – Creative Cloud Ent ALL MLP SW Subscription Only Mun 1S Complete 2G (SKU 65227749) – Actual <u>Commercial</u> Sales**

| Entity | Qty | Unit Price | Total Price | Dates |
|--------|-----|------------|-------------|-------|
| ███ | █ | █ | ███ | █████ |

| Entity | Qty | Unit Price | Total Price | Dates |
|---|---|---|---|---|
| ███████ | ██ | ██████ | ███████ | █████████████████ |
| ██████ | ██ | ██████ | ███████ | █████████████████ |

116.    Tables 14 and 15 below identify four contracts under SKU 65257924. Although the government customer purchased purchased many more units units in each of the contracts, it paid a substantially higher price per unit than the commercial entity that purchased far fewer units.

**Table 14 - Creative Cloud Ent ALL MLP SW Subscription Only ALL 1S Complete 2G (SKU 65257924) – Actual <u>Government</u> Sales**

| Entity | Qty | Unit Price | Total Price | Dates |
|---|---|---|---|---|
| ███████ | ███ | █████ | ████████ | █████████████ |
| ███████ | ███ | █████ | ████████ | █████████████ |
| ███████ | ███ | █████ | ████████ | ████████████████ |
| ██████ | ███ | █████ | ████████ | ██████████████ |

**Table 15 - Creative Cloud Ent ALL MLP SW Subscription Only ALL 1S Complete 2G (SKU 65257924) – Actual <u>Commercial</u> Sale**

| Entity | Qty | Unit Price | Total Price | Dates |
|---|---|---|---|---|
| ████████ | ███ | █████ | ██████ | █████████████████ |

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

117.    Adobe's product with SKU 10006960, Creative Cloud Ent All MLP SW Subscription Only Mun 1S Enterprise, is a similar but better product than the SKUs in Tables 12-15 above. Adobe had a 3-year contract with a commercial customer that was charged a smaller or equivalent price for a better product when it purchased only a few units per year. The government entities identified in Tables 12-15 purchased hundreds of units of a lesser product but paid a higher or equivalent price per unit.

**Table 16- Creative Cloud Ent ALL MLP SW Subscription Only MUN 1S Enterprise (SKU 10006960) ) – Actual <u>Commercial</u> Sale**

| Entity | Qty | Unit Price | Total Price | Dates |
|--------|-----|-----------|-------------|-------|
| ████ | █ | ███ | ███ | ██████ |
| ████ | █ | ███ | ███ | ██████ |
| ████ | █ | ███ | ███ | ██████ |

### 3.    Adobe Violated the False Claims Act

118.    As shown above, the differences in what the Government paid for Adobe products are substantial when compared to commercial customers.

119.    Adobe is a sophisticated company, with a Code of Business Conduct that acknowledges that "Adobe is subject to unique requirements that are considerably stricter when a government entity is our customer or ultimate end customer (such as when Adobe performs as a subcontractor) than when we work with commercial customers." That Code further admonishes employees that they are responsible for knowing any specific requirements that apply to their work with a government entity.

*Complaint - 40*

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

120.   Adobe has the resources to be well-acquainted with its obligations under the GSA MAS regulations to (1) provide truthful pricing information to the Government at the outset of its contractual relationships; (2) inform the Government when it provides concessions or discounts to comparable basis-of-award customers that should also be given to the Government; (3) provide the same concessions and discounts to the Government as it gives to its comparable basis-of-award customers; and (4) refund overcharges to the Government as required by the regulations.

121.   Adobe also has the resources to be well-acquainted with its obligations when negotiating individual contracts with the Government, specifically to provide the Government with truthful and complete information about pricing, discounts, concessions, and anything else required by the Government for its price analysis and ultimate determination whether a price is "fair and reasonable."

122.   Relators' experience was that, among other things, Adobe (1) made little or no effort to monitor commercial pricing to ensure that price reductions were provided to the Government; (2) provided little, if any, any training to its sales personnel about the impact of commercial pricing on government sales; (3) did not refund overcharges to the Government when a relevant  commercial customer was given a discount or concession; and (4) effectively siloed its government sales force from the operations of its commercial sales force, in effect, making it unlikely that sales people in government and non-government sales would be aware of pricing discrepancies between those customer groups.

123.   Relator Hagen further became aware of significant examples, provided above, where the Government paid highly inflated prices for Adobe products when compared to comparable sales to commercial customers.

124.   The facts in the above paragraphs, and throughout this Complaint indicate that Adobe knowingly overcharged the Government for products sold at significantly lesser prices to commercial customers, or at least, acted with deliberate ignorance and/or

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

1  reckless disregard of the truth or falsity of information provided to the Government
2  related to the pricing of its products.

3       125.   This conduct is equally egregious and illegal whether Adobe provided
4  inflated prices directly to the Government or through information provided to third-party
5  resellers.

6       126.   Defendants Carahsoft, CDW-G, and Emergent, are highly experienced
7  third-party resellers to the Government. As shown above in paragraph 78, each of them
8  has sold Adobe products through the GSA MAS for more than a decade (Carahsoft sales:
9  $207,066,885.45;  CDW-G  sales:$136,147,230.78;  Emergent  sales:  $96,797,377.10).
10 Accordingly, none of them can claim ignorance of their obligations to provide the
11 Government with prices that are fair and reasonable as compared to commercial
12 customers.   To the extent that Carahsoft, CDW-G, and Emergent, when selling to
13 government entities, allowed Adobe to negotiate prices for sales that were not fair and
14 reasonable as compared to commercial customers, and to the extent that Carahsoft,
15 CDW-G, and Emergent turned a blind eye to Adobe's reduced commercial sales prices,
16 and the obligations that concessions and reductions placed on third-party resellers to the
17 Government—each of them is also liable for fraudulent sales and failure to refund
18 because their conduct was at least reckless or deliberately indifferent, if not knowing.

19      127.   "[P]rice is an unambiguously material condition under the FCA." *United
20 States ex rel. Bierman v. Orthofix Int'l, NV.,* 177 F. Supp. 3d 712, 715 (D. Mass. 2016)
21 (*citing United States ex rel. Shemesh v. CA,* Inc., 89 F. Supp. 3d 36, 51 (D.D.C. 2015)). If
22 Defendants had disclosed steeply discounted prices for Adobe products offered to non-
23 government, best-of-award customers, this disclosure would have affected the
24 Government's determination of whether the price offered to the Government for the same
25 products in comparable quantities was fair and reasonable. Moreover, the Government
26 would have purchased the lower-priced products if they were offered.

*Complaint - 42*

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

128.   By their conduct, Defendants deprived the Government of the ability to arrive at a fair and reasonable price for its purchase of Adobe products, and instead submitted or caused to be submitted claims for those products with inflated prices.

129.   Because of Defendants' fraudulent conduct, the Government overpaid significantly when it purchased Adobe products that Adobe offered to commercial customers for far less money. The Government was further damaged whenever Defendants did not refund a price concession or refund that it offered to a non-government, best-of-award customer.

130.   Thus, the Government paid more for those products than it would have if Defendants had provided truthful and complete information about its sales to commercial customers.

### Count I: Federal FCA, 31 U.S.C. § 3729(a)(1)(A)

131.   Relators reallege each and every paragraph of this Complaint.

132.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).[25]

133.   As a result of the Defendants' actions, the United States has been, and may continue to be, severely damaged.

### Count II: Federal FCA, 31 U.S.C. § 3729(a)(1)(B)

134.   Relators reallege each and every paragraph of this Complaint.

135.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or

---

[25] To the extent that illegal conduct occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the federal False Claims Act prior to its amendment in 2009. Specifically Count I therefore also alleges violations of 31 U.S.C. § 3729(a)(1).

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).[26]

136.   The United States, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these records or statements, paid false or fraudulent claims.

137.   As a result of Defendants' actions, the United States has been, and may continue to be, severely damaged.

### Count III: Federal FCA, 31 U.S.C. § 3729(a)(1)(G)

138.   Relators reallege each and every paragraph of this Complaint.

139.   As detailed above, Defendants knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).[27]

140.   As a result of Defendants' actions, the United States has been, and may continue to be, severely damaged.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff/Relators Scott Hagen and Kevin Klimaszewski request that this Court:

A.   Enter judgment for the United States Government and the Plaintiffs/Relators and against Defendants;

---

[26] To the extent that illegal conduct occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the federal False Claims Act prior to its amendment in 2009. Specifically Count II therefore also alleges violations of 31 U.S.C. § 3729(a)(2).
[27] To the extent that illegal conduct occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the federal False Claims Act prior to its amendment in 2009. Specifically Count III therefore also alleges violations of 31 U.S.C. § 3729(a)(7).

B.     Order Defendants to cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

C.     Award the United State Government three times the amount of the actual damages sustained by the government as a result of Defendants' violations of the False Claims Act as alleged in this Complaint;

D.     Assess civil penalties in the maximum amount available against the Defendants for each and every false claim Defendants submitted to the United States government in connection with the false statements and false claims alleged in this Complaint;

E.     Award Relators the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

F.     Award prejudgment interest;

G.     Award Relators statutory attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

H.     Grant such other relief as the Court may deem just, necessary, and proper.

## DEMAND FOR JURY TRIAL

Relators hereby demand a trial by jury.

Dated: January 8, 2020

Felicia Gilbert
CA Bar #276348
John McKnight
DC Bar #1031354
Sanford Heisler Sharp, LLP
111 Sutter Street, Suite 975
San Francisco, CA 94104
Tel: 415/795-2020
Fax: 415/795-2021
fgilbert@sanfordheisler.com
jmcknight@sanfordheisler.com

*Complaint* - 45

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

H. Vincent McKnight, Jr.
DC Bar #293811
Sanford Heisler Sharp, LLP
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 200003
Tel: 202/499-5211
Fax: 202/499-5199
vmcknight@sanfordheisler.com

Susan M. Coler
MN Bar #217621
Nathaniel F. Smith
MN Bar ##397276
Halunen Law
80 South 8th Street, Suite 1650
Minneapolis, MN 55402
Tel: 612/605-4098
Fax: 612/605-4099
coler@halunenlaw.com
smith@halunenlaw.com

*ATTORNEYS FOR RELATORS*

*Complaint - 46*